## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x

ED MOLONEY AND ANTHONY MCINTYRE,

                      Plaintiffs,

          -  vs.  -

ERIC H. HOLDER, JR., ATTORNEY GENERAL
OF THE UNITED STATES, and JOHN T. McNEIL,
COMMISSIONER IN RE: Request from the United
Kingdom Pursuant to the Treaty Between the
Government of the United States of America and the
Government of the United Kingdom on Mutual
Assistance in Criminal Matters in the Matter of
Dolours Price.

                      Defendant.

**ECF**

**COMPLAINT FOR
JUDICIAL
REVIEW UNDER
THE
ADMINISTRATIVE
PROCEDURES
ACT, FOR A
DECLARATORY
JUDGMENT, WRIT
OF MANDAMUS
AND INJUNCTIVE
RELIEF**

28 U.S.C. §2201
28 U.S.C. § 1361
5 U.S.C. §702
28 U.S.C. §1331

---------------------------------------------------------------x

## PLAINTIFFS' COMPLAINT FOR JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURES ACT, FOR DECLARATORY JUDGMENT, WRIT OF MANDAMUS AND INJUNCTIVE RELIEF

Plaintiffs Ed Moloney and Anthony McIntyre, by and through their

attorneys, Dornan & Associates PLLC, and the Law Offices of James J.

Cotter III, as and for a Complaint against the Defendants, the Attorney

General of the United States, and the Commissioner so described, hereby

move the Court for judicial review under the Administrative Procedure Act,

5 U.S.C. §702 *et seq,* as well as a Writ of Mandamus under 28 U.S.C.

§1361, compelling the Attorney General to perform the duty he owes to the

Plaintiffs and/or for a Declaratory Judgment and Injunctive Relief, under 28

U.S.C. §2201 (Declaratory Judgment Act), 28 U.S.C. §1331 (Federal

Question).

The Plaintiffs also move the Honorable Court for a Preliminary

Injunction pursuant to Fed. R. Civ. P. rule 65(a) enjoining the Attorney

General and the Commissioner from disclosing to the requesting authorities

in the U.K. under the US-UK Mutual Legal Assistance Treaty, the material

pursuant to the Court's Order of December 27, 2011, and restraining the

Attorney General and the Commissioner from disclosing any of the said

material, until such time as the merits of this instant action may be heard. In

support of their Complaint the Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1.      This action concerns a related action in this Court, namely, IN

RE: Request from the United Kingdom Pursuant to the Treaty Between the

Government of the United States of America and the Government of the

United Kingdom on Mutual Assistance in Criminal Matters in the Matter of

Dolours Price, 11-mc-91078 (WGY).  The Plaintiffs/Intervenors' Motion to

Intervene as of right or for permissive intervention under the Federal Rules

of Civil Procedure, Rule 24(a) or (b) was denied by the Honorable Court on

December 16, 2011 holding *inter alia*, that "Boston College adequately represents any potential interests claimed by the Intervenors. Boston College has already argued ably in favor of protecting Moloney, McIntyre and the interviewees." The Court also found that the Intervenors were prohibited by Article 1 sec. 3 of the US-UK MLAT from asserting a private right of action. See 11-mc-91078, Memorandum and Order of Judge William G. Young, December 16, 2011 attached hereto as **Exhibit A.**

2. On December 27, 2011, the Honorable Court further ordered that the Commissioner's initial subpoena [of May 3, 2011] must be enforced according to its terms and that Boston College must produce to the Commissioner, by Friday December 30, 2011, certain tape recordings, transcripts, notes and computer records pertaining to interviews with Dolours Price.

3. As the interest claimed by the Plaintiffs and their interviewees have demonstrably not been adequately protected by Boston College, and as several of the arguments advanced by the Plaintiffs in their Motion to Intervene have not been addressed by the Honorable Court in its Memorandum and Order of December 16, 2011, the Plaintiffs herewith submit the instant action for a Writ of Mandamus, Declaratory Judgment and

Injunctive Relief, as well as an action for Judicial Review under the Administrative Procedure Act, 5 U.S.C. §702.

4.      The Plaintiffs bring this civil action pursuant to 28 U.S.C. §1361, and 28 U.S.C. §1331, praying for a writ in the nature of mandamus to compel the Attorney General, the Commissioner and those acting under him, to perform the duties he owes to the United States and to the Plaintiffs under the US-UK MLAT, in conjunction with both 18 U.S.C. §3512 and F.R. Crim. P. 17(c)(2).

5.      Apart from the Honorable Court's finding that "the UK-MLAT prohibits [the Intervenors] from challenging the Attorney General's decisions to pursue the MLAT request. UK-MLAT art. 1,¶ 3" the Memorandum and Decision of December 16, 2011 did not provide any analysis of the Intervenors'/Plaintiffs' claim under the Administrative Procedures Act, or address their request for a declaration regarding the failure of the Government's nondiscretionary duties under the US-UK Mutual Legal Assistance Treaty ("MLAT") upon which the Government relies in its subpoenas issued on behalf of the United Kingdom.

6.      Moreover, the Court did not address the Intevenors'/Plaintiffs' claims pursuant to 28 U.S.C. §1361, and 28 U.S.C. §1331, praying for a writ in the nature of mandamus to compel the Attorney General, and those acting

under him, to perform the nondiscretionary duties he owes to the United States, to the Intervenors and to Boston College under the US-UK MLAT, in conjunction with both 18 U.S.C. §3512 and F.R. Crim.P. 17(c )(2).

7.      The Court did not address the Intervenors'/Plaintiffs' request for a declaratory judgment that the subpoenas issued by the Commissioner under 18 U.S.C. §3512, on behalf of the Attorney General, are arbitrary, capricious or an abuse of discretion or otherwise not in accordance with law and contrary to F. R. Crim. P. 17(c)(2).

8.      Accordingly, the Plaintiffs reiterate the claims made in their Motion to Intervene by way of this instant action.

## II. PARTIES AND JURISDICTION

9.      Plaintiff Ed Moloney resides in the Bronx, New York. Plaintiff Anthony McIntyre is a resident of Drogheda in the Republic of Ireland, and is the spouse of a U.S. Citizen and father of two U.S. citizens.  Both Plaintiffs are interviewers of a number of the participants in the Belfast Project, and are interested parties.

10.      Eric H. Holder, Jr. is the Attorney General of the United States, and has authority under the Article 2.2 of the MLAT to provide or withhold legal assistance to the United Kingdom.  The Attorney General is sued herein in his official capacity.

11.     John T. McNeil is an Assistant United States Attorney for the District of Massachusetts and is the Commissioner appointed IN RE: Request from the United Kingdom Pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom on Mutual Assistance in Criminal Matters in the Matter of Dolours Price. The Commissioner is sued herein in his official capacity.

12.     The jurisdiction of this Court in this action is asserted pursuant to 28 U.S.C. §§1331 (federal question), as well as 28 U.S.C. §2201 (Declaratory Judgment Act) as well as the Administrative Procedure Act ("APA"), 5 U.S.C. §702 *et seq*.  There is an actual controversy between the parties within this Court's jurisdiction as hereinafter more fully appears.

13.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (e).  The claims in this suit arose in this District, and both the Attorney General and the Commissioner are officers or employees of the United States acting in their official capacity or under color of legal authority.  No real property is involved in this action.  Venue also is proper pursuant to 28 U.S.C. §§1331 (federal question) and 1332(a)(1) (diversity of citizenship).

14.     The scope of review under the APA is set forth at 5 U.S.C. §706, pursuant to which the Court shall decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the

meaning or applicability of the terms of an agency action." The Court shall (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law etc.

### (i)     The Plaintiffs Enjoy a Private Right of Action

15.     The Plaintiffs are not barred from asserting any private right of action pursuant to Article 1, § 3 of the US-UK MLAT, which states that the Treaty "is intended solely for mutual legal assistance between the Parties. . . [and] shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."

16.     The original, master MLAT agreement, namely the Agreement on Mutual Legal Assistance Between the United States of America and the European Union ("Master MLAT"), contains additional language that an MLAT shall not "expand or limit rights otherwise available under domestic law."  Master MLAT at Article 3(5), emphasis added.  The absence of this

language in the US-UK MLAT does not lead to any express limitation of rights available under domestic law.

17.     As the Government, in issuing its subpoenas, was required to invoke the Honorable Court's discretionary authority under 18 U.S.C. §3512, this in turn allows the Plaintiffs to raise a challenge under F.R. Crim.P. 17(c)(2), pursuant to which the Honorable Court may quash the subpoenas if compliance would be "unreasonable or oppressive."

18.     In considering the Subpoena request, the Honorable Court may consider the discretionary factors set forth at *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247-49, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004),  including whether "the person from whom discovery is sought is a participant in the foreign proceeding"; "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; and whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." Id., 542 U.S. at 264-65, 124 S.Ct. 2466.

19.     The Plaintiffs seek to challenge the Government's "unduly intrusive or burdensome" request and "unreasonable or oppressive" actions

or inactions in light of proceedings which may arise from disclosure of the material under subpoena.  The Plaintiffs' private right of action arises under domestic law, namely the implementation of the US-UK MLAT by means of 18 U.S.C. §3512.   The US-UK MLAT neither extinguishes the Intervenors' rights under domestic law, nor permits the Government to circumvent the Federal Rules in its pursuit of a Subpoena requests.

20.     The Government is not entitled to the Tape recordings subject to subpoena as a matter of law, but must pursue its subpoena request only pursuant to the Honorable Court's discretionary authority under 18 U.S.C. §3512, and subject to the rigors of F.R. Crim.P. 17(c)(2).  The question as to whether or not compliance with the subpoena requests in this case would be "oppressive or unreasonable" must necessarily include an examination of the Government's compliance, and that of the United Kingdom, with the terms of the US-UK MLAT.

21.     The Plaintiffs are not seeking to "obtain, suppress or exclude any evidence or to impede the execution of a request," but rather to enforce the Government's compliance with clearly defined standards under the US-UK MLAT.  If the Plaintiffs' claims based on the failure of the Attorney General to follow the US-UK MLAT standards are upheld, the Plaintiffs

seek to remand the matter to the Attorney General to act on the request based on proper consideration of the MLAT standards.

22.     There is no article in the MLAT, or elsewhere, which prohibits the enforcement of specific MLAT standards.

### III. FACTS AND PROCEDURAL HISTORY

23.     On or about May 3, 2011, the Commissioner appointed by the Court and acting on behalf of the Defendant Attorney General issued three subpoenas (the "May Subpoenas") to the Trustees of Boston College, as well as two of its representatives, Robert K. O'Neill, the Director of the John J. Burns Library, and Thomas E. Hachey, Professor of History and Executive Director of the Center for Irish Studies at Boston College ("Respondents"). Exhibit A, p 3. The subpoenas seek, on behalf of the Police Service of Northern Ireland ("PSNI"), the production of materials gathered and maintained under the strictest conditions of confidentiality which form an oral history archive of participants active during the period of conflict in Northern Ireland known as the "Troubles," a conflict which was largely resolved as a result of the U.S. sponsored Good Friday Agreement ("GFA") of April 10, 1998.  *Id,* p.4, 6-8.

24.     The objective of the oral history archive (the "Belfast Project") is to collect and preserve for academic research and possible future

publication of the memories of members of republican and loyalist paramilitary and political organizations in the Northern Ireland conflict. *Id*, p 4. The research sought to provide insight into the minds of people who become personally engaged in violent conflict. *Id.*, p 5. Its progenitors saw it as a vital project to understanding the conflict in Northern Ireland and other conflicts around the world. *Id.*

25.     The May Subpoenas commanded the production of tape recordings and interviews, and transcripts and materials relating to tape recorded interviews, with Brendan Hughes[1] and Dolours Price. *Id.*, p. 3.

26.     A second set of subpoenas dated August 3, 2011 (the "August Subpoenas"), was served on Boston College on August 4, 2011. *Id.*, p. 4. The August Subpoenas sought original audio and video recordings of "any and all interviews containing information about the abduction and death of Mrs. Jean McConville," along with written transcripts, summaries, and indices of such interviews, and records that describe the arrangement and circumstances of the recordings and the chain of custody of the recordings.

27.     On June 7, 2011, Boston College filed a motion to quash or modify the May subpoenas. Exhibit A, p. 3. The government opposed the motion to quash and requested that the Court enter an order compelling

---

[1] As Brendan Hughes is deceased, the conditions of confidentiality terminated, and Boston College has produced responsive documentation.

Boston College to produce the materials responsive to the commissioner's subpoenas.  *Id.*  After the government voluntarily narrowed the subpoenas, Boston College filed a new motion to quash.  *Id.* The government opposed both motions to quash. *Id.*

28.     The Defendants, in issuing the underlying subpoenas, claimed to derive authority to do so under 18 U.S.C. §3512 in conjunction with the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland ("UK"), signed December 16, 2004, implementing the Mutual Legal Assistance Agreement with the European Union, signed June 25, 2003, S. Treaty Doc. No. 109-13 ("US-UK MLAT").  **Exhibit B.**

29.     On August 31, 2011, the Plaintiffs filed a Motion for Leave to Intervene pursuant to Fed. R. Civ. P., Rule 24(a) or (b), raising their own claims and in support of the motions of Boston College to quash the subpoenas.

30.     On December 16, 2011, the Honorable Court denied the motions of the Trustees of Boston College to quash the commissioners subpoenas, and granted the request of Boston Colleges for an *in camera* review of materials responsive to the subpoenas to the Court.  The Court ordered Boston College to produce copies of all materials responsive to the

Commissioner's subpoenas to the Court for *in camera* review by noon on December 21, 2011, in order to allow time for Boston College to request a stay from the Court of Appeals.  Boston College declined the option to appeal or request a stay from the Court of Appeals.

31.     The Honorable Court further denied the Plaintiffs' motion to intervene as of right as well as their motion for permissive intervention under Federal Rule of Civil Procedure 24(a) and (b) respectively.

32.     At a hearing on December 20, 2011, the Court ordered Boston College to deliver to the Court by noon on Wed. Dec. 21, 2011 for in camera review the following: 13 Delours Price transcripts with word index, CD in pdf form, 3 DVDs in PAL, 1 CDR. With respect to the 24 IRA interviewees and 192 interviews, Boston College will submit by Noon on Wed. Dec. 21, 2011 an affidavit as to which interviewees it has determined are germane, how many there are, and how long it will take Boston College to submit these.

33.     On December 22, 2011, the Court ordered Boston College to deliver all remaining 192 transcripts of IRA interviewees to the Court for *in camera* review by noon, Tuesday, December 27, 2011.  The Court reminded Boston College of its responsibility to identify specific interviews that the

Burns Library and Boston College have determined to be germane, per the hearing on Dec. 20, 2011 and accompanying clerk's notes.

34.　　On December 27, 2011, Boston College produced to the Court 176 transcripts of interviews with 24 interviewees "formerly associated with the IRA."  Boston College further offered to provide documentation from the Belfast Project which was extraneous to and additional to both the May subpoenas and the Court's orders, in that Boston College stated that it "is working with the United States Attorney's Office to obtain a list of search terms for Boston College to use in searching the pdfs of the non-IRA transcripts for information that relates to the abduction or death of Mrs. McConville, which transcripts, if any, will then be submitted to the Court for review *in camera.*" **Exhibit C.**

## IV CAUSES OF ACTION

### (A)　　The Plaintiffs' Claim for Judicial Review under the APA

35.　　Under 5 U.S.C. §702, a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

36.　　As a result of the failure of the Attorney General, and those acting under him, to perform the duties owed to the Plaintiffs, and to have regard to important public policy considerations, or to assess the political

character of the offense at issue, the Plaintiffs have been placed in danger of physical harm, the peace process in Northern Ireland is subject to destabilization, and the important public policy of maintaining an unique oral history record relating to the "Troubles" in Northern Ireland is in danger of irreparable damage.  See Exhibit D, Affidavit of Ed Moloney ¶¶ 3-13; Exhibit E, Affidavit of Anthony McIntyre, ¶¶ 3-13; Exhibit F, Affidavit of Carrie Twomey, ¶¶ 3-11.

37.     As the Plaintiffs have been denied the option to intervene, they have no means of redress other than this instant action, and have exhausted all administrative remedies prior to filing this Complaint.  In the alternative, they claim an exception as this case raises constitutional questions, and also because any delay for administrative action would cause irreparable injury to the Plaintiffs.

38.     Pursuant to Article 18 of the US-UK MLAT, the Attorney General was obliged to consult with the United Kingdom regarding those of the United Kingdom's obligations, as well as the obligations of the United States, under the US-UK Extradition Treaty (Treaty Doc. 108-23) which related to the subject matter of the US-UK MLAT, such as the Good Friday Agreement.

39.     In particular, pursuant to Article 18, the Attorney General was obliged to consider the proviso to the US-UK Extradition Treaty, which is directly relevant to the subject matter of the underlying request for assistance under the US-UK MLAT, and which clearly sets forth the sense of the Senate regarding the prosecution of offences addressed in the Good Friday Agreement.

40.     In considering the law enforcement treaties, the clear intent of the Senate was that the United Kingdom would not employ the Extradition Treaty, and by extension the companion law enforcement provisions of the US-UK MLAT, to reopen issues addressed in the Belfast Agreement, or to impede any further efforts to resolve the conflict in Northern Ireland.

41.     Pursuant to Article 3, the Attorney General is further charged under the US-UK MLAT with the obligation to have regard to important public policy considerations, and to assess the political character of the offense at issue, before legal assistance may be provided.

42.     The Attorney General has failed to carry out his obligations under the US-UK MLAT, by failing (a) to make the findings required by Article 3 prior to issuing the subpoenas and (b) to carry out the consultative functions delegated to him by law under Article 18. In so doing, he has breached the duties he owes to the United States, his duty to have regard to

important public policy considerations, and his duties to those directly affected by his subpoenas requests.

43.     The Attorney General has failed to have regard to the important public policy, as articulated by the Senate, of prescribing law enforcement efforts which seek to reopen matters address by the Belfast Agreement.

44.     The Attorney General is further in violation of his obligations under the US-UK MLAT and 5 USC § 706, by failing to consider whether the underlying offense at issue was political in character, and in doing so acted in excess of his authority or limitations, and without observance of procedure required by law.

45.     The Attorney General is aware, or should be aware, that the request for mutual legal assistance on the part of the PSNI is unreasonable as it is merely a fishing expedition which is highly unlikely to lead to any prosecution in the requesting jurisdiction.

46.     The Attorney General's knowledge, in light of the above, would render the enforcement of the subpoenas unreasonable and/or oppressive contrary to F.R. Crim. P. 17(c).

47.     The First Circuit set forth in *Conservation Law Foundation, Inc. v. Busey*, 79 F.3d 1250, 1261 fn42 (1st Cir. 1996) that "an implied right of action is not a predicate for a right of judicial review under the APA."

The central purpose of the APA is to "provid[e] a broad spectrum of judicial review of agency action." *Id, citing Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Therefore, "[a] cause of action for review of [agency] action is available [under the APA] absent some clear and convincing evidence of legislative intention to preclude review." *Id.*

48.    Article 1, § 3 of the US-UK MLAT does not preclude judicial review of the Attorney General's actions, as it merely states that "[t]he provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."   The Article relates to private rights regarding evidence, but is silent on judicial review of the Attorney General's compliance with the terms of the US-UK MLAT.   Absent clear and convincing language, the Plaintiffs are entitled to review under the APA.

### (i)    The Attorney General has failed to Comply with MLAT Standards

49.    The Plaintiffs further request that the Honorable Court remand this matter to the Attorney General with instructions that his decision to provide legal assistance to the PSNI/UK be reviewed in light of the requirements of Articles 1 sec. 1bis, 3 sec. 1(a) and (c)(i) and 18 sec. 1. of the MLAT (collectively, the "MLAT Standards").   These sections provide that a request for legal assistance:

a.      shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place. MLAT Article 1 sec. 1bis (emphasis added);

b.      may be refused if the "Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy." MLAT Article 3 sec. 1 (a);

c.      may be refused if the "requests relates to an offence that is regarded by the Requested Party as (i) an offence of a political character." MLAT Article 3 sec. (c) (i); and,

d.      shall require the Parties or Central Authority to "consult promptly at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular request...Such consultation may in particular take place if, in the opinion of either Party or Central Authority…either Party has rights or obligations under another bilateral or Multilateral agreement relating to the subject matter of this Treaty."  MLAT Article 18 sec. 1. (Emphasis added.)

50.      The First Circuit in *Taylor v. U.S. Dept. Of Labor*, 440 F.3d 1, 9 (1st Cir. 2005) stated that "[W]here there is a sufficient or meaningful standard provided in the governing statute, courts have something "against which to judge the agency's exercise of discretion," and judicial review is allowed.

51.      The "agency discretion" exception to review is a "very narrow exception" to be "narrowly construed" and "should be invoked only where the substantive statute left the courts with no law to apply."  *Id. citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).  "If no judicially manageable standards are available for judging how and when an

agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretions." *Id.*

52.     Through the MLAT Standards, the Honorable Court has clearly codified law to apply and has "judicially manageable standards" against which to judge and evaluate the actions or inactions of the Attorney General. The MLAT Standards are "definite standards" and "judicially enforceable." See *Medellin v. Texas*, 522 U. S. 491, 550, 556, 561 (Breyer, J., dissenting)(2008).

53.     Accordingly, before any legal assistance may be provided under the US-UK MLAT, the Attorney General was obliged, under Article 18 of the US-UK MLAT, to engage in a consultation with his U.K. counterpart where either the United States or the United Kingdom "has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty."  The Attorney General was also obliged, under Article 3 of the US-UK MLAT, to consider the essential interests of the United States, as well as public policy grounds, and whether or not the offence was one of a political character.

54.     In particular, before the Attorney General could issue any subpoenas under the US-UK MLAT, he was obliged by the terms of the Article 18 of the treaty to consult with the U.K. Secretary of State for the

Home Department (or a person or agency designated by him) regarding the U.K.'s obligations under the related Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related exchanges of letters, signed at Washington on March 31, 2003 ("US-UK Extradition Treaty") (Treaty Doc. 108-23).  See **Exhibit B**, Congressional Research Report on Extradition Between the United States and Great Britain: the 2003 Treaty.

55.     The proviso to the US-UK Extradition Treaty, considered by the same Senate Foreign Relations Committee to which was referred the US-UK MLAT, is directly relevant to the subject matter of the underlying request for assistance under the US-UK MLAT,  and the proviso clearly sets forth the sense of the Senate regarding the prosecution of offences addressed in the Good Friday Agreement:

> "The Senate is aware that concerns have been expressed that the purpose of the Treaty is to seek the extradition of individuals involved in offenses relating to the conflict in Northern Ireland prior to the Belfast Agreement of April 10, 1998. The Senate understands that the purpose of the Treaty is to strengthen law enforcement cooperation between the United States and the United Kingdom by modernizing the extradition process for all serious offenses and that the Treaty is not intended to reopen issues addressed in the Belfast Agreement, or to impede any further efforts to resolve the conflict in Northern Ireland."

Exhibit B, CRS-28.

56.     Relying upon assurances evidenced by an exchange of letters between the governments of the United Kingdom and the United States, the Senate noted with approval:

> "[T]he statement of the United Kingdom Secretary of State for Northern Ireland, made on September 29, 2000, that the United Kingdom does not intend to seek the extradition of individuals who appear to qualify for early release under the Belfast Agreement."

Id., CRS-29.

57.     Furthermore, the United Kingdom Home Secretary, in a letter to the Attorney General of the United States on March 31, 2006, reiterated this position:

> "In September 2000 the Government decided that it was no longer proportionate or in the public interest to seek the extradition of individuals convicted of terrorist offences committed prior to 10th April 1998, the date of the Belfast Agreement."

Id, CRS-30.

58.     As the government of the United Kingdom explicitly made these promises to the Senate in the exchange of letters with the U.S. Attorney General, they form part of the US-UK Extradition Treaty as Amended and Supplemented, which it is respectfully submitted, the Court must take into account for the purpose of these proceedings.

59.     The public interest in not seeking the extradition of individuals for pre-GFA offenses could be read as having a global application.  In fact,

the subject matter of the U.K. government's request involves a politically-related offense committed prior to the Good Friday Agreement, and will require the U.K. government to initiate extradition proceedings of an Irish national from the Republic of Ireland for an offense allegedly committed in the jurisdiction of the Republic of Ireland. Such an event would violate the US-UK Extradition Treaty as Amended and Supplemented by the Letters given by the U.K. Government to the Senate Foreign Relations Committee in order to secure its ratification by the Senate.

60.     Either the Attorney General has failed to consult with his counterpart as required by Article 18, or he has failed to consider the import of those assurances given to the United States Senate by the United Kingdom, whereby the United Kingdom agreed not to reopen issues addressed in the GFA or to impede efforts to resolve the conflict in Northern Ireland. Accordingly, the Attorney General is in non-compliance with a bilateral treaty such as the US-UK Extradition Treaty as Amended and Supplemented by the Exchange of Letters by the U.K. Government to the Senate Foreign Relations Committee.

61.     In their affidavits, the Plaintiffs clearly have established that the subject matter of the subpoenas concern matters addressed by the GFA, and that the material sought could impact on continuing efforts to resolve the

conflict.   Exhibit D, Moloney Affidavit ¶¶ 4-14.   Exhibit E, McIntyre Affidavit ¶¶ 14, 15.

> **(ii)    The Plaintiffs Have Set Forth a Case or Controversy Sufficient to Grant then Article III Standing**

62.    In order to obtain review under the Administrative Procedure Act (the "APA"), an aggrieved party must have Article III standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was designed to protect some threatened concrete interest of the [party] who must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the party.  *Massachusetts Independent Certification v. Johanns,* 486 F. Supp. 2d 105 (D. Mass 2007).   The Article III requirement for standing is rather "modest."   *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116 (1st Cir. 1999) (Lynch, Cir. J. concurring and citing Wright, Miller and Kane, *Federal Practice and Procedure*, (2nd 1986), sec. 1901 at 288.)

63.    In order to determine if a party has standing, the court reviews three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-562 (1992):  First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.*

64.     The injuries alleged by the Plaintiffs are concrete and particularized in that the injuries will affect the Plaintiffs "in a personal and individual way." *Lujan, supra* 504 U.S. 560, ftn. 1. The Plaintiffs have alleged that personal harm will occur if the Tapes are released. See Affidavit of Anthony McIntyre, Exhibit E ¶¶ 3-13; Affidavit of Carrie Twomey, Exhibit F ¶¶ 3-11. As discussed below, the constitutional rights which the Plaintiffs seek to protect are constitutionally sufficient for Article III standing.

65.     The harm which may befall the Plaintiffs is imminent.  If the Tapes are released, the harm to the Plaintiff Moloney's First Amendment rights will occur immediately upon such release.  Because Plaintiff McIntyre lives in the Republic of Ireland, he may be subject immediately to reprisals

by disgruntled paramilitaries. See Affidavit of Anthony McIntyre, Exhibit E ¶¶ 3-13; Affidavit of Carrie Twomey, Exhibit F ¶¶ 3-11.

66.    The "link in the chain of causation between the challenged Government conduct and the asserted injury" is sufficiently strong to sustain the Plaintiffs' standing.   See *Allen v. Wright*, 468 U.S. 737, 758-759 (1983).

### (iii)    The Plaintiffs also have Prudential Standing

67.    In addition to Article III standing, a party seeking relief under the APA must also have prudential standing which is determined by the zone of interest test.  *Harvey v. Veneman*, 396 F.3d 28 (1st Cir. 2005).  In order to satisfy the zone of interest test for prudential standing courts first discern the interests arguably to be protected or regulated by the statute, and then determine whether the plaintiff's interests arguably fall within that same zone of interests [*City National Credit Union Association v. First National Bank Trust,* 522 U.S. 479, 492 (1998)]; only a party claiming an interest that is marginally related to or inconsistent with the purpose implicit in the statute should be precluded from judicial review under this test.  *Clarke v Securities Indus. Association*, 479 U.S. 388, 389 (1987);  *Massachusetts Independent Certification*, 486 F. Supp. 2d at 117-118.

68.    The zone of interest test is not meant to be "especially demanding."  *Clarke, supra*, 479 U.S. at 399.  The Plaintiffs' interest is that

the Attorney General should comply with the US-UK MLAT Standards lest their constitutional right to life and First Amendment rights be jeopardized.

69.     Plaintiffs respectfully request that the Court compel the Attorney General to perform his duties under  Article 3 of the US-UK MLAT to consider how legal assistance in this case (a) would impair the essential interests of the United States which are, *inter alia*, set forth in the US-UK MLAT, and expressed in the Extradition Treaty and attached letters, as well as the GFA; (b) would be contrary to important public policy considerations of the United States; and (c) is directed to an offense of a political character.

70.     In light of the foregoing, Plaintiffs respectfully request that the Court compel the Attorney General to perform his duties under Article 18 of the US-UK MLAT to consult with the U.K. Secretary of State for the Home Department with regard to the U.K.'s request for legal assistance, in light of both the U.K.'s obligations and assurances under the US-UK Extradition act, and the GFA, as well as the likelihood of any prosecution arising from the production of the requested materials.

### (B)     The Plaintiffs Claim for a Declaratory Judgment

71.     The Plaintiffs further request that the Court declare that the subpoenas issued by the Commissioner, on behalf of the Attorney General,

are unreasonable and oppressive contrary to F. R. Crim. P. 17(c)(2), in that the Attorney General, contrary to his obligations, has (a) failed to have due regard to the sense of the Senate clearly expressed in the proviso to the US-UK Extradition Treaty, which bears direct relevance to the assistance sought and (b) failed to have due regard to important public policy considerations before agreeing to provide legal assistance (c) failed to assess the political character of the offense at issue before legal assistance may be provided, and (d) failed to have due regard to the unlikelihood of any prosecution arising as a result of the materials requested.

72.     The provisions of 18 U.S.C. §3512 are clear, and must be read in the context of the self-executing US-UK MLAT to effect a result consistent with the intent and expectation of the treaty signatories, as well as the overriding legislative purpose.

73.     Further, or in the alternative, the Plaintiffs seek a declaration from the Court that the 18 U.S.C. §3512 request conceals an attempt to circumvent proof-gathering limits in the United Kingdom and/or other policies of the United Kingdom, and that the request is otherwise unduly intrusive and burdensome.

74.     On September 28, 2006, President George W. Bush referred the US-UK MLAT to the Senate Committee on Foreign Relations, along with

24 other similar bilateral agreements,  to implement the Mutual Legal Assistance between the United States of America and the European Union ("EU2"), signed on June 25, 2003.  **Exhibit E.**

75.     In the same letter of referral, the President stated that a "parallel agreement with the European Union on extradition, together with bilateral instruments" would be transmitted to the Senate separately, and stated that these law enforcement agreements would "modernize and expand in important respects the law enforcement relationships between the United States and the 25 EU Member States, as well as formalize and strengthen the institutional framework for law enforcement relations between the United States and the European Union itself."  *Id.*  The President made clear that The Agreement includes a non-derogation provision making clear that the US-UK MLAT is "without prejudice to the ability of the United States or an EU Member State to refuse assistance where doing so would prejudice its sovereignty, security, public, or other essential interests." *Id.*

76.     On September 29, 2006, of all the parallel extradition agreements with EU member states, the same Senate Committee on Foreign Relations which considered the US-UK MLAT[2], raised concerns in only

---

[2] The US-UK MLAT was ratified on September 23, 2008.

matter, namely, the Extradition Treaty with the United Kingdom (Treaty Doc. 108-23).  **Exhibit B,** CRS-1**.**  The Senate addressed concerns that the purpose of the Extradition Treaty was "to seek the extradition of individuals involved in offenses relating to the conflict in Northern Ireland prior to the Belfast Agreement of April 10, 1998."  *Id.,* CRS-28.   Accordingly, the Senate included language in a proviso to the treaty, based on assurances it had received from the United Kingdom, to the effect that the law enforcement provisions of the Extradition Treaty were "not intended to reopen issues addressed in the Belfast Agreement, or to impede any further efforts to resolve the conflict in Northern Ireland." *Id.*

77.     The underlying subpoenas seek records regarding offenses relating to the conflict in Northern Ireland prior to the Belfast Agreement of April 10, 1998.  11-mc-91078 (WGY) Government Motion in Opposition to Motion to Quash pp 2-4.

78.     Upon information and belief, the PSNI, which is the law enforcement agency responsible for investigating criminal offenses in Northern Ireland, has not made any attempts to seek the production of any interviews of Dolours Price from news reporting sources in Northern Ireland, where the PSNI has jurisdiction.  See Government's Opposition to

Motion to Quash and Motion to Compel at p.4; Government's Opposition to Motion to Quash New Subpoenas and Motion to Compel at p.1, 2.

79.     Upon information and belief, Dolours Price is not subject to personal jurisdiction in the United Kingdom, as she is resident in the Republic of Ireland, and in the event of a prosecution arising from the requested materials, the United Kingdom would be required to seek her extradition from the Republic of Ireland.

80.     Whereas the subpoenas were issued with the stated purpose of "assisting the United Kingdom regarding an alleged violation of the laws of the United Kingdom," upon information and belief, the Republic of Ireland has subject matter jurisdiction over some or all of the alleged offenses which underpin the subpoenas requests.

81.     The Attorney General is charged under Article 3 of the US-UK MLAT with the requirement to have regard to essential interests of the United States or requests which would be contrary to important public policy considerations of the United States, as well as to assess the political character of the offense at issue, before legal assistance may be considered. **Exhibit B** p.8.

82.     The Attorney General improperly and unreasonably has failed to have regard to the essential interests and/or important public policy

considerations of the United States, as required by Article 3.1(a) of the US-UK MLAT, relating to offenses committed prior to the Good Friday Agreement, as articulated by the United States Senate.

83.    Furthermore, the Attorney General improperly and unreasonably has failed to assess whether the criminal investigation at issue involved an offense of a political character as required by Article 3.1(c)(i) of the US-UK MLAT.

84.    The Attorney General has further failed to have regard to the unreasonableness and oppressiveness of the PSNI's request for assistance, as required by 18 U.S.C. §3512 and F.R. Crim. P. 17(c)(2).

85.    Upon information and belief, prior to burdening the Honorable Court with a request for legal assistance, the PSNI has not engaged in any good faith attempts to seek the production of any interviews of Dolours Price from news reporting sources in Northern Ireland within the PSNI's own jurisdiction.  See 11-mc-91078 Ex. 14: Government's Opposition to Motion to Quash and Motion to Compel ("Government Opposition") at p.4.

86.    Furthermore, the Attorney General has failed to advise the Honorable Court of the limits of the PSNI's prosecutorial reach.  Upon information and belief, Dolours Price lives in the Republic of Ireland and is not subject to personal jurisdiction in the United Kingdom.  For any chance

of a prosecution to arise from production of the requested materials, the United Kingdom would be required to seek her extradition from the Republic of Ireland, a process which will necessarily be fraught with difficulty.[3]   Upon information and belief, such an event is highly improbable, based in part on past history of extradition between the U.K. and the Republic of Ireland, the GFA and the European Arrest Warrant procedures.   See **Exhibit G,** European Council Framework Decision of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States (2002/584/JHA).

87.     The United Kingdom stated to the Attorney General of the United States on March 31, 2006 that it was "no longer proportionate or in the public interest to seek the extradition of individuals convicted of terrorist offences committed prior to 10th April 1998, the date of the Belfast Agreement."   Upon information and belief, the PSNI cannot proceed with a prosecution without seeking the extradition of Dolours Price from the Republic of Ireland.

88.     Furthermore, the subpoenas were issued upon representation to the Honorable Court that the stated purpose was to "assist[] the United

---

[3] See European Council Framework Decision of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States (2002/584/JHA).  Article 4.7: The executing judicial authority may refuse to execute the European arrest warrant where the European arrest warrant relates to offences which are regarded by the law of the executing Member State as having been committed in whole or in part in the territory of the executing Member State or in a place treated as such.

Kingdom regarding an alleged violation of the laws of the United Kingdom." However, the PSNI request for assistance is disingenuous, as the Republic of Ireland has subject matter jurisdiction over some or all of the alleged offenses which underpin the documents subject to subpoena. See Exhibit 1 to the Government Opposition, which alleges that the alleged execution(s) of IRA informers transported by Dolours Price occurred in County Monaghan, which is in the jurisdiction of the Republic of Ireland.

89.     The Plaintiffs seek a declaration that the PSNI's request for legal assistance under 18 U.S.C. §3512 conceals an attempt to circumvent proof-gathering limits in the United Kingdom, as well as the laws and policies of the both the United States and the Republic of Ireland, and renders this request unduly intrusive and burdensome[4]. See *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 245 (2004). The discretionary *Intel* factors include whether or not "the person from whom discovery is sought is a participant in the foreign proceeding"; "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; and whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies

---

[4] Article 1 (1bis) of the US-UK MLAT also states that "Assistance shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place."

of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." Id., 542 U.S. at 264-65, 124 S.Ct. 2466.

90.     The PSNI has requested information under 18 U.S.C. §3512 which it has made no attempt to discover in the United Kingdom. See *Application of Asta Medica, S.A.*, 981 F.2d 1, 5 (1st Cir. 1992). Accordingly, the Attorney General, in evaluating the reasonableness of the request, has failed to ascertain if the materials requested would be more readily discoverable under the laws of the United Kingdom, whether any attempt has been made to discover these materials by the Requesting Party, and/or if they are intended for use in a viable prosecution in Northern Ireland.

91.     If, in the absence of this critical information, the Honorable Court's order of December 27, 2011 is not stayed or reversed, and if materials from the oral history project are released without the consent of the confidantes, the risk of physical harm to the Plaintiffs would be heightened, and the harm to the oral history project will be irreparable. Exhibit C, Affidavit of Ed Moloney ¶¶3-13; Exhibit D, Affidavit of Anthony McIntyre ¶¶ 3-13; Exhibit E, Affidavit of Carrie Twomey ¶¶ 3-11.

92.     Moreover, the risk of damage to fragile community relationships addressed by the Good Friday Agreement will have been placed in jeapordy. Exhibit C, Affidavit of Ed Moloney ¶¶3-13.

### (C) The Plaintiffs Constitutional Claims

93.     In issuing the subpoenas, the Attorney General has also violated the Plaintiffs' constitutional right to freedom of speech, and in particular their freedom to impart historically important information for the benefit of the American public, without the threat of adverse government reaction.  See *In Re Special Proceedings*, 373 F.3d 37, 45 (1st Cir. 2004):

94.     The three leading cases in this circuit require "heightened sensitivity" to First Amendment concerns and invite a "balancing" of considerations (at least in situations distinct from *Branzburg*).  *Cusumano,* 162 F.3d at 716-17; *LaRouche,* 841 F.2d at 1182-83; *Bruno,* 633 F.2d at 596-99. In substance, these cases suggest that the disclosure of a reporter's confidential sources may not be compelled unless directly relevant to a nonfrivolous claim or inquiry undertaken in good faith; and disclosure may be denied where the same information is readily available from a less sensitive source. *See Cusumano,* 162 F.3d at 716-17; *LaRouche,* 841 F.2d at 1180; *Bruno,* 633 F.2d at 597-98.

95.     The Attorney General has also ignored the reporters' privilege in the protection of their confidential sources.   See *Sinnott v. Boston Retirement Board*, 524 N.E.2d 100 (Mass. 1988), cert. denied, 109 S.Ct. 528 (1988) [the Court may weigh the public interest in the free flow of information against the litigant's need for the information and the availability of information from other sources in deciding whether a reporter should be protected from disclosure of a source or information].

96.     As discussed in the Plaintiffs' Affidavits, the Defendants' actions further endanger the Plaintiffs' inherent Constitutional right to life. Exhibit C, Affidavit of Ed Moloney ¶¶3-13; Exhibit D, Affidavit of Anthony McIntyre ¶¶ 3-13; Exhibit E, Affidavit of Carrie Twomey ¶¶ 3-11.

97.     The   Defendants'action threatens Boston's College's oral history project to which the Plaintiffs have made historic contributions, contrary to the constitutional rights and privileges of the Plaintiffs

WHEREFORE, Plaintiffs hereby respectfully respect an order and judgment in their favor against the Defendants, jointly and severally, for the following relief:

(a)     That the Honorable Court issue a Preliminary Injunction pursuant to Fed. R. Civ. P. rule 65(a) enjoining Boston College from disclosing the material pursuant to the Court's Order of December 27, 2011,

and restraining the Attorney General and the Commissioner from disclosing any of the said material, until such time as the merits of this instant action may be heard;

   (b) that the Court remand this matter and compel the Attorney General and those acting under him, to (a) to make the findings required by Article 3 prior to issuing the subpoenas and (b) consult with the U.K. Secretary of State for the Home Department (or a person or agency designated by him), as required by Article 18, regarding the related Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related exchanges of letters, signed at Washington on March 31, 2003 ("US-UK Extradition Treaty") (Treaty Doc. 108-23);

   (c) stay the enforcement of the subpoenas until such time as the Attorney General has provided the Honorable Court with a report of such consultation;

   (d) declare that the Attorney General has failed in his obligation to consider the proviso to the US-UK Extradition Treaty, and that the US-UK Extradition Treaty is directly relevant to the subject matter of the underlying request for assistance under the US-UK MLAT;

(e)     declare that the Attorney General has failed to have regard to important public policy considerations in seeking to reopen matters address by the Belfast Agreement;

(f)     declare that the Attorney General has violated the Plaintiffs' constitutional right to freedom of speech, and in particular their freedom to impart historically important information to the American public, without the threat of adverse government reaction;

(g)     declare that the Attorney General has endangered the Plaintiffs' constitutional right to life;

(h)     declare that the Attorney General has failed in his obligations to consider whether the underlying offense at issue was political in character, and in doing so acted in excess of his authority or limitations, and without observance of procedure required by law contrary to the Administrative Procedures Act at 5 U.S.C. § 706;

(i)     declare that the 18 U.S.C. §3512  request conceals an attempt to circumvent proof-gathering limits in the United Kingdom, or laws or policies of the Republic of Ireland, and that the request is otherwise unduly intrusive and burdensome.

(j)     grant to the Plaintiffs those costs and reasonable attorneys' fees incurred by the Plaintiffs in this action pursuant to the 5 USC

§ 552(a)(4)(E) and/or the Equal Access to Justice Act ("EAJA"), 28 U.S.C.

§ 2412(d) and 5 U.S.C. § 504 *et seq*.

   (k) grant such other and further relief as the Court may deem

just and proper under the circumstances.

Dated: December 29, 2011
   Boston, Massachusetts

       Respectfully submitted,


       LAW OFFICES OF JAMES J.
       COTTER, III MA BBO 101620

       By:_____
        /s/James J. Cotter, III

       Post Office Box 270
       N. Quincy, MA 02171
       Tel. 617 899-0549
       Fax 617 984-5858

       DORNAN & ASSOCIATES PLLC

       By:_____
        /s/Eamonn Dornan (ED 7990)
       *Appearing Pro Hac Vice*

       1040 Jackson Avenue, Suite 3B
       Long Island City, New York 10017
       Tel: (718) 707-9997
       Fax: (718) 228-5940
       *Attorneys for Plaintiffs*
       Ed Moloney and Anthony McIntyre