UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ED MOLONEY, and ANTHONY McINTYRE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 11-12331-WGY ) ) |
| ERIC H. HOLDER, JR., Attorney General, and JOHN T. McNEIL, Commissioner, | ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' CONSOLIDATED MEMORANDUM
IN OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS**

Following this Court's denial of their motion to intervene in *In Re: Request from the United Kingdom, etc.*, M.B.D. No. 11-91078-WGY ("*In Re: Request from the U.K.*"), the plaintiffs Ed Moloney and Anthony McIntyre have filed this action against Attorney General Eric Holder and John McNeil, Commissioner, making essentially the same claims and arguments as those raised in *In Re: Request from the U.K.* For substantially the same reasons urged by the government against intervention, plaintiffs' motion for a preliminary injunction here should be denied and their complaint dismissed.

**INTRODUCTION**

In light of the Court's familiarity with the underlying facts and legal arguments, *see* Document No. ("D.") 32 in 11-mc-91078, and in the interest of brevity, the defendants forego a detailed description of plaintiffs' new complaint and the related

proceedings in *In Re: Request from the U.K.* The defendants simply note that the plaintiffs in this action seek, *inter alia*, (1) judicial review of the Attorney General's actions under the Administrative Procedure Act, Act, 5 U.S.C. §§ 701 - 706 ("APA"); (2) declaratory relief on a variety of subjects; (3) a writ of mandamus compelling the Attorney General to perform certain duties under a Treaty and thereafter to report to the Court; and (4) injunction relief, including a preliminary injunction, prohibiting the defendants from disclosing the materials at issue to the government of the United Kingdom under the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, signed December 16, 2004, implementing the Mutual Legal Assistance Agreement with the European Union, signed June 25, 2003, S. Treaty Doc. No. 109-13 ("US-UK MLAT").

### A.   The Plaintiffs Lack Standing to Sue

Neither plaintiff can show the "concrete and particularized injury" that is necessary to establish the constitutional standing needed for their legal claims against the Attorney General and the Commissioner. *See generally Becker v. Federal Election Commission*, 230 F.3d 381, 384-85 (1st Cir. 2000) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)). Neither plaintiff claims to possess the information sought by the subpoenas, and neither plaintiff has any obligation to respond to the subpoenas. Neither plaintiff alleges he is a target of the underlying investigation.

Even were there a legitimate First Amendment right at stake (which there is not), any such right belongs not to plaintiffs but to Boston College, which possesses the information sought by the subpoenas and has the obligation to disclose it in accordance with the Court's orders.  The plaintiffs' alleged First Amendment interest is abstract and lacks the concreteness necessary to satisfy Article III's standing requirement.  *See Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 55 (1st Cir. 2001); *Town of Norwood v. F.E.R.C.*, 202 F.3d 392, 405 (1st Cir. 2000).  The Belfast Project ended in May 2006.[1]  Their past employment by Boston College has not conferred on them some unique status or Constitutional right.

Messrs Moloney and McIntyre assert that the disclosure of the tape recordings and related materials to law enforcement officials would jeopardize their personal safety.  This claim, however, is simply too speculative to meet the "concrete and particularized injury" test.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (plaintiff's injury-in-fact must be "actual or imminent, not conjectural or hypothetical") (internal quotations and citations omitted); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26-27 (1st Cir. 2007) (same).  As pointed out by the Government in *In Re: Request from the U.K.*, *see* Opposition to Motion to Quash and Motion for an Order to Compel (D.7) at 16, both plaintiffs have already widely publicized their respective involvement in

---

[1] *See* Ex. E to Complaint (D.1-6) at ¶ 3; and Ex. 2 to proposed Complaint attached to Motion to Intervene in *In re Request from the U.K.*, (D. 18-2) at ¶ 26.

the Belfast Project. The public filing of their affidavits in *In Re: Request from the U.K.* and in the instant case has further established this as a matter of public record. It is pure speculation to suggest that the disclosure of the subpoenaed materials to law enforcement officials will cause someone to engage in a criminal act against the interviewers.[2] Any asserted interest in protecting the safety of plaintiffs' sources does not suffice to establish standing, as they are in no position to rest their claims on the interests of third parties. *Warth v. Selden*, 422 U.S. 490, 499 (1975); *see Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).[3]

To the extent the Complaint can be read to assert that Mr. Moloney and Mr. McIntyre each has an interest in protecting an independent and personal "duty of confidentiality" to interviewees, any such assertion lacks substance. First, there is no legally-cognizable "duty of confidentiality." Second, the impacts of any breach of confidentiality are on the recipients of the promise, not on the plaintiffs. In any event, disclosure of information by the recipient of the subpoena, Boston College, does not violate *plaintiffs'* duty of confidentiality, and plaintiffs have neither standing nor a legal right of action to try to protect any such duty belonging to Boston College.

---

[2] Notably, the Affidavit of Mr. McIntryre's wife recounts fear for personal safety going back to 2000, and threats and an incident of vandalism to their neighbor's home associated with the publication of Mr. Maloney's book in the spring of 2010 -- well before the initiation of *In Re: Request from the U.K.* Affidavit of Carrie Twomey (D.1-8) at ¶¶ 3, 8-9.

[3] For the same reason, plaintiffs lack standing to assert the interests of any target of the underlying investigation.

### B. The US-UK MLAT Does Not Give Rise to Judicially Enforceable Private Rights

As they did in their Motion to Intervene in *In Re: Request from the U.K.*, D.18-1, plaintiffs here assert that they are entitled to relief because the Attorney General has failed properly to fulfill his obligations under the US-UK MLAT. The contention rests on two provisions of the US-UK MLAT. First, the Complaint asserts that the Attorney General failed to make findings supposedly required by Article 3, § 1 of the US-UK MLAT, which sets forth certain reasons why the Attorney General may refuse assistance. Complaint ¶¶ 40-45. Second, the Complaint asserts that the Attorney General has failed to properly fulfill his obligation to consult with his counterpart in the U.K. with regard to "rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty," pursuant to Article 18, § 1 of the US-UK MLAT. *Id*. ¶¶ 53-60.

As the government pointed out previously, the US-UK MLAT by its terms does not give rise to any private rights. Article 1, § 3 of the MLAT provides:

> This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Courts considering this provision have uniformly ruled that private persons have no legal right to enforce an MLAT. For example, in *U.S. v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 658-659 (3d Cir. 2002), the court considered a claimant's

argument that the seizure and subsequent forfeiture of his money violated the then-existing version of the US-UK MLAT because the United States was obligated to consult with the United Kingdom's Home Secretary before seizing the accounts. Relying on the identical language of Article 1, § 3 quoted above, the court ruled that "the treaty explicitly states that it is not intended to provide a private remedy," and held, "[t]herefore, even it if is assumed for argument's sake that the United States violated the MLAT, Claimants have no private right to enforce its terms." 286 F.3d at 659.

More recently, in a case where the defendant asserted that evidence against him was improperly admitted at trial because it was gathered in violation the MLAT between the Netherlands and the United States, *United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007), the Second Circuit held that the evidence was not obtained in violation of the MLAT, and also ruled:

> A second reason [defendant's] MLAT argument fails is that he cannot demonstrate that the treaty creates any judicially enforceable individual right that could be implicated by the government's conduct here. As the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels. *See Head Money Cases*, 112 U.S. 580, 598 (1884) (noting that "treaty is primarily a compact between independent nations" and "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it"). For any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases. Thus, a proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply "a strong presumption

>against inferring individual rights from international treaties."
>*United States v. De La Pava*, 268 F.3d 157, 164 (2d Cir. 2001).

506 F.3d at 129-130.

The district court in *U.S. v. Chitron Electronics Co. Ltd.*, 668 F.Supp.2d 298, 306-307 (D. Mass. 2009) (Saris, D.J.), reached the same conclusion in rejecting a defendant's claim that a summons was ineffective because service of the summons failed to comply with the MLAT between the United States and China.  The court stated succinctly, "the MLAT does not create a private right of enforcement of the treaty."  *Id*.  *See generally Medellin v. Texas*, 552 U.S. 491, 505-506 (2008); *United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) ("treaties do not generally create rights that are privately enforceable in the federal courts.").[4]

### C. The Administrative Procedure Act Provides No Right of Judicial Review Here

Plaintiffs apparently contend that, notwithstanding the above authorities, they are entitled to judicial review under the APA.  Of course, none of the decisions recognizing

---

[4] The plaintiffs suggest that in this action they are entitled to invoke the standard of review applicable under 18 U.S.C. § 3512 and Rule 17(c)(2) of the Federal Rules of Criminal Procedure.  *See* Compl. ¶¶ 4, 6-7, 17.  There is no basis, however, for incorporating those criminal laws into this civil action brought under the APA.  The relevant inquiry under the APA is set forth in 5 U.S.C. § 706, and includes whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  In contrast, 18 U.S.C. § 3512 is primarily procedural in nature and has no relevance to the issues raised by the plaintiffs.  Similarly, Fed. R. Crim. P. 17(c)(2) governs the circumstances in which a district court may quash a subpoena, and this too has no relevance to an APA action for review of the Attorney General's actions.

there is no individual right of action to enforce an MLAT even hints that plaintiffs could circumvent that limitation by the mere expedient of making a claim under the APA. That is because they can't.

1. The US-UK MLAT Precludes Judicial Review

The APA by its terms does not apply where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). *See generally Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984); *Natural Resources Defense Council v. Johnson*, 461 F.3d 164, 171-172 (2nd Cir. 2006); *Sarit v. U.S. Drug Enforcement Admin.*, 987 F.2d 10, 16-17 (1st Cir. 1993). The presumption favoring judicial review may be overcome by "specific language" or "inferences of intent drawn from the statutory scheme as a whole." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 673 & n. 4 (1986). In this context, the US-UK MLAT is appropriately regarded as a "statute." *See In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 568 (9th Cir. 2011) ("A ratified self-executing treaty generally stands on the same footing as a federal statute").

Article 1, § 3 of the MLAT could not be more clear in foreclosing this action. The plaintiffs' APA claims are premised on the contention that the treaty gives rise to an enforceable right to preclude the execution of a request for assistance if the treaty's obligations are not fulfilled. This contention is precisely what Article 1, § 3 precludes.

Plaintiffs invoke *Conservation Law Foundation, Inc. v. Busey*, 79 F.3d 1250, 1261 (1st Cir. 1996), to suggests their APA claim is authorized by the court's recognition of a

"broad spectrum of judicial review of agency action," and its statement that "an implied right of action is not a predicate" for such review.  *See* Complaint ¶ 47. Their reliance on *Busey*, however, is misplaced.  The *Busey* court rejected the argument that APA review of an agency decision was unavailable because of Supreme Court precedent indicating that the statute there did not create an implied private right of action for damages.  The issue here is not whether the US-UK MLAT creates an implied private right of action for damages, but instead whether the treaty negates any right of a private party to seek enforcement of the treaty's terms in order to impede the execution of a request.  The text of the treaty compels an affirmative answer.  The US-UK MLAT "is intended solely for mutual legal assistance between the Parties."  It "shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."[5]

That the US-UK MLAT precludes APA review here is strongly supported by long-standing Supreme Court precedent concerning judicial review of questions of foreign affairs.  "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."  *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also In re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d at

---

[5] The plaintiffs assert that Article 1, § 3 of the US-UK MLAT "relates to private rights regarding evidence, but is silent on judicial review of the Attorney General's compliance with the terms of the US-UK MLAT." Complaint ¶ 48. If by this the plaintiffs mean that they do not seek to enjoin enforcement of the subpoenas but merely seek judicial review of the Attorney General's actions, the Court should reject this as disingenuous; it is obvious that plaintiffs' true intent is stop the execution of the subpoenas.

572-573 ("[t]he court's role in this context is limited, however, and must be tempered by the recognition that 'the field of foreign affairs' is one that 'the Constitution entrusts to the President and the Congress.'") (quoting *Zschernig v. Miller*, 389 U.S. 429, 432 (1968)). Similar principles are at play in cases recognizing the "strong presumption against inferring individual rights from international treaties." *United States v. Rommy*, 506 F.3d at 129, quoting *United States v. De La Pava*, 268 F.3d at 164.

    The judicial intervention sought by the plaintiffs here is inconsistent with these principles. According to the plaintiffs, this Court should compel the Attorney General to consult with the U.K. Secretary of State "regarding the U.K.'s obligations under the related Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related exchanges of letters. . . ." Complaint ¶54. They ask this Court to determine whether the Attorney General gave due regard "to essential interests of the United States or requests which would be contrary to important public policy considerations of the United States, as well as to assess the political character of the offense at issue, before legal assistance may be considered." *Id*. ¶ 81. The plaintiffs would have this Court rule on whether "[t]he Attorney General improperly and unreasonably has failed to have regard to the essential interests and/or important public policy considerations of the United States . . . relating to offenses committed prior to the Good Friday Agreement . . . ." *Id*. ¶ 82. These issues would embroil the Court in matters directly involving relations between the United States and the United Kingdom.

An instructive case is *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 942-943 (D.C. Cir. 1998), in which private parties sued to enforce a decision of the International Court of Justice ("ICJ") which had held that America's support of military actions by the so-called "Contras" against the government of Nicaragua violated both customary international law and a treaty between the United States and Nicaragua. The court of appeals first held that domestic law provided no basis for enforcing the judgment of the ICJ. 859 F.2d at 935-942. The court then addressed whether the APA provided any independent basis for relief. In ruling it did not, the court observed that:

> [i]n theory, a law such as the APA could supersede these limitations in the ICJ statute, transforming ICJ decisions into legal standards for domestic judicial review. But, as Professor Davis explains, the APA does not possess such generative capacity. "Because the APA provision on reviewability is always dependent on other law, the law of reviewability is essentially the same as it would be without any APA provision." 5 K. Davis, Administrative Law Treatise § 28.1, at 256 (2d ed. 1984) (emphasis in original); see also id. at § 29.1. In sum, the APA does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law.

Id. at 942-943. Here, there is an even more compelling case against affording APA review because the US-UK MLAT, which expressly denies a right of action to private parties, affirmatively vitiates any substantive basis for reviewing the Attorney General's decision to provide assistance.

11

### 2. The Challenged Actions Are "Committed to Agency Discretion by Law"

The APA also does not apply to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney*, 470 U.S. 821 (1985) (holding that an agency's decision not to undertake certain enforcement action is not subject to judicial review under the APA). It is apparent from the text of the US-UK MLAT that the determinations of the Attorney General challenged in this case are textually committed entirely to his discretion. Under Article 3, § 1(a), the Attorney General "may" refuse assistance if "the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy." Under Article 3, § 1(c)(I), the Attorney General "may" refuse assistance if "the request relates to an offence that is regarded by the Requested Party as: (1) an offence of a political character." The words "may," "of the opinion," and "regarded by the Requested Party" convey complete discretion. And to recognize a right to judicial review of such matters would entangle the courts in national and international policy questions about what would "impair" the United States' "sovereignty, security, or other essential interests" or would be "contrary to important public policy." *See Haig v. Agee*, 453 U.S. at 292.

Similarly, whether and in what fashion the Attorney General is obliged to request consultation with his counterpart in the U.K. under Article 18, § 1 of the US-UK MLAT, is a matter properly within the unconstrained discretion of the Attorney General. Section

1, on which plaintiffs rely, provides that "[t]he Parties, or Central Authorities" shall consult, "at the request of either . . . if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty." The duty to consult arises only "at the request" of either Party; the treaty imposes no obligation to make a request, thus leaving that decision entirely to the discretion of the Party. "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative - 'the political' - departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).

The traditional presumption against judicial review of matters involving foreign relations brings the claims here squarely within the APA exception as applied in *Heckler v. Chaney*, which involved an analogous action – an agency's discretion to refuse to take enforcement action – and which the Supreme Court held "should be presumed immune from judicial review under § 701(a)(2)." 470 U.S. at 832.

### D. The Plaintiffs' Claim Under the Declaratory Judgment Act Should Be Dismissed

The Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide an independent basis of jurisdiction for the plaintiffs' claims against the Attorney General. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("[T]he operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.") (internal quotation

marks and citations omitted); *accord, Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir.1996) ("the Declaratory Judgment Act . . . [does not] constitute a waiver of sovereign immunity because the Act 'neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief.'") (quoting *McCarthy v. Marshall*, 723 F.2d 1034, 1037 (1st Cir.1983)).[6]  As demonstrated above, there is no independent basis for jurisdiction of the claims asserted in the Complaint; consequently the Declaratory Judgment Act is of no avail.

### E.     Mandamus Is Unavailable Here

It is well-established that the writ of mandamus will issue "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *accord, Heckler v. Ringer*, 466 U.S. 602, 616 (1984) ("The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."); *and see In re City of Fall River, Massachusetts*, 470 F.3d 30, 32 (1st Cir. 2006) ("Mandamus is regarded as an extraordinary writ reserved for special situations."). As discussed previously, Article 1, § 3 of the US-UK MLAT makes it clear that the Attorney

---

[6] *See also*, *Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto*, 522 F.3d 1, 5 (1st Cir. 2008) ("That Act merely 'makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis.'") (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir.1995)).

General owes no legal duty under that treaty to the plaintiffs, much less one that is nondiscretionary. This forecloses any possibility of mandamus relief.

>     F.   **The Complaint's Constitutional Claims Are Unfounded**

Both plaintiffs allege violations of their First and Fifth Amendment rights. Mr. McIntyre's constitutional claims should be rejected because, as a non-resident alien living in Ireland (see Complaint ¶ 5), he has no rights under our Constitution. "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson v. Eisentrager*, 339 U.S. 763, 784-85 (1950) (same).[7] Mr. McIntyre does not reside in United States or claim to be a U.S. citizen; therefore, he has no standing to invoke rights under the Constitution. The fact that his wife and children are U.S. citizens is of no significance. They are not parties to this case, and Mr. McIntyre is in no position to claim standing based on the interests of non-parties. *Warth v. Selden*, 422 U.S. 490, 499 (1975).

---

[7] *See also Bridges v. Wixon*, 326 U.S. 135, 148, 161 (1945) (observing that resident aliens have First Amendment rights, but noting that "an alien obviously brings with him no constitutional rights"); *Boumediene v. Bush*, 476 F.3d 981, 991 (D.C. Cir. 2007) ("Precedent in this court and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States.").

With regard to Mr. Moloney, his claim of a First Amendment interest is too remote and speculative, for the reasons explained in Part A of this Argument, above. Furthermore, as argued in the Government's Opposition to Motion to Quash and Motion For an Order to Compel in *In Re: Request from the U.K.* (D.7 at 13-15), the Supreme Court has rejected the notion of a First Amendment privilege to conceal information in the face of a subpoena in a criminal matter, and, in any event, any First Amendment interest he may have is currently being afforded ample protection in the ongoing proceedings in *In Re: Request from the U.K.*[8]

Mr. Moloney's Fifth Amendment claim -- the alleged violation of his "constitutional right to life" (Complaint ¶¶ 27, 54) -- lacks factual and legal substance. To begin with, the proposed Complaint is devoid of any facts that would suggest that Boston College's compliance with the subpoenas would create a meaningful risk to Mr. Moloney's life. His Affidavit expresses no concern that his own safety would be jeopardized by compliance with the subpoenas. This makes sense, inasmuch as he makes no claim that he was a member of the IRA nor does he claim that he was subject to a code of silence. He does not allege that he himself disclosed confidential information about the IRA in the course of the interviews; and he lives in the United States, far from the locus of the historic conflict. The unsupported allegation in the Complaint that Boston

---

[8] The government's argument in *In Re: Request from the U.K.*, which is incorporated by reference as if fully set forth herein, applies with greater force to Mr. Moloney, who has not received a subpoena and who was simply an agent of Boston College at the time of the interviews.

16

College's compliance with the subpoenas will create risk to his personal safety is purely speculative, and given the absence of supporting facts, should be rejected. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . .") (citations omitted).

In any event, the Fifth Amendment's Due Process clause is simply not implicated here, for either plaintiff. Any risk at issue here is indirect -- the harm would be inflicted by a third person acting independently and unlawfully. "[A]n indirect and incidental result of the Government's enforcement action . . . does not amount to a deprivation of any interest in life, liberty, or property." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 787 (1980); *accord, Castle Rock v. Gonzales*, 545 U.S. 748, 767 (2005) (quoting *O'Bannon* and holding that plaintiff had no procedural due process right to enforcement of a restraining order); *DeShaney v. Winnebago County Department of Soc. Serv.*, 489 U.S. 189, 195 (1989) ("a state's failure to protect an individual against private violence simply does not constitute a violation of the due process clause.").[9] Moreover, the Attorney General's conduct does not "shock the conscience" or otherwise offend substantive due process. *See Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("only the most egregious official conduct" would violate due process principles; "[liability for negligently inflicted harm is categorically beneath the threshold of constitutional due

---

[9] *And see Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1041 (D.C. Cir. 1998).

process."); *Evans v. Avery*, 100 F.3d 1033 (1st Cir. 1996); *and see Collins v. City of Harker Heights*, 503 U.S. 115 (1992) (holding that the due process clause does not guarantee employees a workplace that is free from unreasonable risks); *compare McIntyre v. United States*, 336 F. Supp. 2d 87, 107 (D. Mass. 2007).

In short, the plaintiffs' constitutional claims are unfounded and form no basis for relief.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction should be denied, and the Complaint should be dismissed.

>                                   Respectfully submitted,
>
>                                   CARMEN M. ORTIZ
>                                   United States Attorney
>
>   By:    /s/ *George B. Henderson, II*
>                                   George B. Henderson, II
>                                   Barbara Healy Smith
>                                   Assistant U.S. Attorneys
>                                   John J. Moakley U.S. Courthouse
>                                   1 Courthouse Way, Suite 9200
>                                   Boston, MA 02210
>                                   (617) 748-3272

Dated: January 5, 2012                                  George.Henderson2@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 5, 2012.

>                                   /s/ *George B. Henderson, II*

Dated: January 5, 2012                                  George B. Henderson, II